# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39019**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Luis F. SANTOS**
Senior Airman (E-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 23 August 2017

————————————

*Military Judge:* Mark W. Milam.

*Approved sentence:* Dishonorable discharge, confinement for 18 months, and reduction to E-1. Sentence adjudged 9 October 2015 by GCM convened at Joint Base San Antonio-Fort Sam Houston, Texas.

*For Appellant:* Captain Patrick A. Clary, USAF.

*For Appellee:* Major Mary Ellen Payne, USAF; Captain Tyler B. Musselman, USAF; Gerald R. Bruce, Esquire.

Before HARDING, SPERANZA, and C. BROWN, *Appellate Military Judges.*

Senior Judge HARDING delivered the opinion of the court, in which Judge SPERANZA and Judge C. BROWN joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

HARDING, Senior Judge:

A general court-martial composed of a military judge sitting alone con-victed Appellant, contrary to his pleas,[1] of one specification for sexual assault of Airman First Class (A1C) SM and one specification for abusive sexual con-tact of A1C EM, both in violation of Article 120, Uniform Code of Military Jus-tice (UCMJ), 10 U.S.C. § 920. The military judge acquitted Appellant of a sep-arate specification for aggravated sexual contact of EM. Appellant was sen-tenced to a dishonorable discharge, to be confined for 18 months, reduction to the grade of E-1, and to forfeit all pay and allowances. The convening authority disapproved the adjudged forfeitures, deferred and waived the automatic for-feitures for the benefit of Appellant's dependents, but otherwise approved the adjudged sentence.

On appeal, Appellant raises two assignments of error: (1) in light of *United States v. Hills,* 75 M.J. 350 (C.A.A.F. 2016) and *United States v. Hukill*, 76 M.J. 219 (C.A.A.F. 2017), the military judge erred by admitting the evidence of each charged offense to be used as propensity evidence under Military Rule of Evi-dence (Mil. R. Evid.) 413 to prove the other two offenses; and (2) the evidence is factually and legally insufficient to sustain his conviction for abusive sexual contact of EM.

Our superior court's holdings in *Hills* and *Hukill* compel us to set aside the conviction for the abusive sexual contact of EM and the sentence. Having set aside that conviction, we do not address Appellant's second AOE. Finding no further prejudicial error, we affirm the sexual assault conviction.

## I. BACKGROUND

### A. Appellant and the "Friend Zone"

Appellant met the named female victims in this case, EM and SM, while all three attended military medical training in early 2014. By the time of the commission of the offenses in early October and November of 2014, the three Airmen had become "best" friends and spent the vast majority of their off-duty time together. At no time, however, did either EM or SM date Appellant or

---

[1] Apparently through inadvertence, no plea was entered on the record. Article 45(a), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 845(a), provides, however, that "if an accused after arraignment . . . fails . . . to plead, a plea of not guilty shall be en-tered in the record and the court shall proceed as though he had pleaded not guilty." Notwithstanding the lack of entry of a plea, both parties and the military judge pro-ceeded as if a plea of not guilty had been entered on Appellant's behalf. As Appellant was ensured a trial on the merits, we find no prejudice. See *United States v. Taft*, 44 C.M.R. 122 (C.M.A. 1971).

otherwise harbor any romantic interest toward him. Both EM and SM considered Appellant to be firmly anchored in the "friend zone."

Upon completion of their medical training, EM, SM, and Appellant all reported for assignments at Joint Base San Antonio (JBSA). SM lived on JBSA-Lackland while both Appellant and EM lived in the same dormitory building on JBSA-Fort Sam Houston. These three Airmen and others in their immediate circle of friends spent their off-duty time together going to movies, out to eat, shopping, or hanging out in each other's dormitory rooms reading or watching movies. Appellant, EM, and SM frequently confided in each other about the details of their personal lives to include their dating relationships and family issues. EM and SM also relied on Appellant for "guy counsel." They both occasionally referred to Appellant as their "gay best friend" and did so in Appellant's presence. SM testified that she believed Appellant was gay. EM testified her use of this phrase had nothing to do with Appellant's sexual orientation but was "like calling him one of the girls." EM further explained that the use of the phrase conveyed that she considered Appellant a very close friend and in the "friend zone." EM defined friend-zone as "not hanging out with [a guy] because you're dating, you're hanging out with him because your [sic] friend." Additionally, for EM "friend zone" meant a strictly platonic relationship.

**B. The Camping Trip – EM Declines Appellant's Romantic Overture**

Near the end of August 2014, EM joined Appellant and four other service members on a camping trip to a beach near Port Aransas, Texas. EM, the only female on the trip, had not previously met the other campers. EM initially hesitated to go on the trip when asked by Appellant. However, after she met and was also invited by Specialist IM, she decided to go as she found IM "adorable." After spending the day on the beach, the campers retired to their respective tents. EM and Appellant shared a tent. At some point after Appellant and EM had gone to sleep for the night, Appellant draped his arm over EM and then "he kind of rubbed [her] side and like lightly kissed [her] neck." EM responded to Appellant's attempt to initiate sexual activity by telling him that they were "just friends" and that she did not want to ruin their friendship. Appellant stopped what he was doing and they went to sleep. The next morning the entire group went out for breakfast, spent more time at the beach, and then returned to San Antonio. Appellant's romantic overture at the beach did not come up in conversation again for many months. EM "assumed that [Appellant] heard [her] loud and clear and that there was no need to discuss it." The trip to the beach did turn out to be significant to EM for another reason. In the weeks and months after the beach trip, EM and IM began to spend time together one on one and became romantically involved. By the time of trial, EM and IM were married.

**C. EM and SM Leave Appellant Sexually Explicit Post It Notes**

Later in September, a few weeks after the camping trip to the beach, EM and SM spent an evening in Appellant's room watching movies while Appellant was at work. Appellant had wireless internet and readily gave permission to his friends to borrow his room for internet access. EM and SM communicated with Appellant throughout the night using text-messaging and Snapchat. They sent him a picture of themselves after applying a green exfoliating mask to their faces. Appellant responded to the picture with the message "you look hawt [sic]." EM replied with words to the effect of "thanks you're sweet; and that there [were] two ladies laying in [his] bed in underwear lol," "lol" meaning laugh out loud. EM and SM then found a pad of Post-It Sticky Notes and decided as a joke to leave messages for Appellant to find when he got home. Some of the messages were sexually explicit, particularly a note purportedly signed[2] by both EM and SM and addressed to Appellant. It stated "we know your [sic] laying in bed jerking it to the thought of us! We did the same." Another message was created by incorporating the word "Snuggle" from a box of fabric softener of the same name. By writing directly on the box, the message "wish you would come snuggle with me" was left for Appellant.

**D. Abusive Sexual Contact of EM**

On the evening and morning of 6 and 7 October 2014, the events that unfolded between Appellant and EM in Appellant's dormitory room provided the primary evidentiary basis for the abusive sexual contact conviction as well as the specification of aggravated sexual contact that Appellant was acquitted of. Specifically, Appellant was convicted of causing bodily harm to EM by placing his hand on her breast with an intent to gratify his sexual desire. The military judge acquitted Appellant of a specification alleging that Appellant did, by using unlawful force, press EM down while touching her buttocks.

For EM, the evening started in the dorm room of another female friend, KD, to watch a movie and help KD study. Appellant soon joined EM and KD bringing pizza and a bottle of rum. While Appellant and KD partook of the rum, EM abstained as she was recovering from being sick. After a couple of hours, KD indicated to Appellant and EM that she was ready to go to sleep and it was time for them to leave. EM and Appellant went to Appellant's room just one floor down from KD's room. Once in Appellant's room, EM lay down on Appellant's bed to read a magazine and Appellant sat on his bed to watch a movie. EM's elbows rested on Appellant's knees.

After a while, Appellant began to caress the back of EM's neck and shoulders. In response, EM told Appellant: "[w]ell if you're going to do that, you

---

[2] SM testified that she did not sign this message.

might as well like give me a backrub." EM testified that she did not consider a backrub from Appellant to be a romantic gesture because they "had done it before and nothing sexual came out of it." EM was wearing sweat pants, a light cotton tee-shirt, a new bra, and underwear. She pulled her shirt slightly over her head in order to expose her bare back to Appellant. She still had her arms in the sleeves and the shirt covered her chest. Unlike on prior occasions when Appellant had given EM a massage, Appellant used lotion this time. After Appellant had squirted some on her back, EM told him not to get the lotion on her new bra. Appellant then unsuccessfully attempted to unhook EM's bra which prompted EM to unhook it herself.

With her shirt pulled up and her bra unhooked, Appellant proceeded to massage the lotion into EM's bare back. EM testified that Appellant pressed more deeply into her back during this massage than on previous occasions and that this confused her. EM raised up to look over her shoulder and asked Appellant what he was doing. Appellant responded by placing his hand in the middle of EM's back and  pushing her back down on the bed. At this point, EM could tell that Appellant was sexually aroused as she could feel his erect penis pressed against her through his and her clothing. Appellant then moved his hands down to EM's waistline and pulled the back of her sweat pants down to her mid buttocks. At this point, Appellant's hand touched EM's buttocks. EM testified that she told Appellant to stop and that she did not want to do this.

After Appellant had touched EM's buttocks, in addition to telling Appellant to stop, EM rolled over on her back, tucked her knees up, and put her hands up. Appellant, after pressing EM's legs apart, positioned himself between EM's legs. EM's hands were now pushing against Appellant's chest. EM testified that she continued to tell Appellant to stop but he responded by telling her it would make their friendship closer. Appellant then moved his hands under EM's shirt and bra and touched EM's breast. EM then "gave up fighting" and "dropped [her] hands, kind of by [her] head." EM stated that she pulled her hands back because she needed a moment to process what was happening and that she was growing tired. Appellant then leaned in to kiss EM as he continued to grab EM's breast. EM turned her head away and Appellant's lips grazed her neck.  At some point EM said to Appellant: "[t]here you go, you got a handful, now stop." After about 15 to 30 seconds, Appellant took his hand off EM's breast and moved it down toward her waist. As Appellant began to slide his fingers underneath her waistband, EM grabbed his wrist. Appellant then sighed and asked EM why touching below the waist was any different than being allowed to touch her above the waist. EM responded "because I said so." Shortly thereafter, EM got out of the bed, hooked her bra, and left Appellant's room.

EM did not immediately make a report to Air Force authorities or tell her friends that Appellant had sexually assaulted her. Instead she characterized it to her friends and her boyfriend, IM, as "something weird that had happened" between her and Appellant. EM testified that she was conflicted as to whether to report what happened due to the expected impact that reporting Appellant would have on her and their group of friends. Only after being called in by Air Force Office Special Investigations (AFOSI) on or about 20 November 2014 for an interview about SM's allegation against Appellant did she describe what happened to her in Appellant's dorm room on 7 October 2014 as a sexual assault. While EM downplayed the potential influence that her relationship with IM had on the timing and content of her report, her relationship with IM supports an argument that EM had a motive to characterize what happened in Appellant's dorm room as an assault rather than a situation that she created, encouraged, allowed to go too far, and later regretted.[3]

**E. Sexual Assault of SM**

As with EM, about a month later SM found herself with Appellant in his dorm room late at night watching a movie. As far as SM was concerned she was just hanging out with her "best friend" watching a movie after dinner and a night out with their common group of friends. SM borrowed shorts and a tee-shirt from Appellant and changed out of the jeans and top she had worn to go out. After changing clothes she lay on Appellant's bed and got under his covers. Appellant sat up in his bed over the covers. SM soon fell asleep. She testified as follows about what woke her up:

> I felt [Appellant's] hand inside of me. He was fingering me. He had my – the shorts that I borrowed from him and my underwear pulled to the side. And I felt his erection pressed against my leg and he was kissing my neck and breathing heavily. I just went numb. I couldn't – I couldn't think about anything. I just needed to get out of there. So, I elbowed him in the chest and told him to f**k off and grabbed most of my stuff and I ran out of their [sic] barefoot. He turned over and let out a deep sigh. So, when I got to my car, I threw my stuff into the passenger seat and locked the door. And I texted [EM] that I just woke up to [Appellant] fingering me, and I'm heading back to Lackland. I took off the clothes that [Appellant] let me borrow that night, threw it in the corner of my room, and got in the shower and sat on the floor of the shower holding my knees for a really long time. Later when

---

[3] As they began their dating relationship, IM had expressed some uneasiness about how much EM "hung out" with Appellant. According to EM, after she explained to IM that she and Appellant were truly just friends, IM's concerns subsided.

I looked at my phone I saw text messages from [Appellant] apologizing to me for what he did the night before.

## F. Appellant's Incriminating Statements – Sexual Assault of SM

Unlike the specification alleging the abusive sexual contact of EM, the specification alleging sexual assault of SM was supported by evidence of multiple incriminating statements made by Appellant. Appellant's apology in a text message to SM the next morning, his near confession during an AFOSI-directed pretext phone call with SM, and Appellant's other admissions made to third parties, provided overwhelming evidence of Appellant's guilt for the sexual assault of SM.

### 1. Appellant's Text Message to SM the Next Morning

Appellant sent the following apology to SM through text messaging the morning after.

> I'm a retarded f**king idiot. I know sorry probably doesn't mean sh*t to you but I honestly feel terrible. I barely slept last night because of how sh*tty I feel. You and [EM] are the best people I know here and I don't want you to hate me. I deserve to get my ass kicked for being a dipsh*t. I've never been "THAT" guy before and I can't live with knowing that you think I'm some perverted piece of sh*t because I'm not. I'm just extremely f**king stupid and I'll do anything to not have you despise me right now. You were one of the few people who helped me and actually gave a sh*t when I told you about my mom's situation and I'm forever grateful for that. I know you have a lot of crap on your plate right now and the last thing you need is for some d**khead to come and pull this petty sh*t. Like I said, you can tell me to shove my sorries up my a** and I'll understand, but please know I'm not taking this lightly. I love you guys too much to not give a sh*t about your opinions of me.

### 2. SM's AFOSI-Directed Pretext Phone Call to Appellant

A couple of weeks later, after SM had reported the sexual assault to AFOSI, steps were taken to facilitate a pretext phone call between SM and Appellant. Unwittingly, EM was convinced to relay a message to Appellant that SM needed him to apologize and admit what he did to her in order for her to get closure. This was a deliberate effort by AFOSI to increase the likelihood that Appellant would not find the timing of the phone call odd or suspicious. EM was not aware that the phone call that she set into motion was based on a pretext. Appellant provided multiple incriminating responses during the course of the 18-minute phone call. When repeatedly asked by SM for an explanation as to why he thought it was "OK" for him to digitally penetrate her,

Appellant consistently maintained that he thought she was awake. When pressed for a further detailed explanation, Appellant stated that he did not know what made him think it was "OK." As the call continued, SM expressed that she doubted Appellant's sincerity due to his apparent inability to actually say what he did. This challenge to Appellant prompted the following responses.

> I'm owning up to what I did. I know exactly what I did. *I know it was wrong.* But I can't just keep repeating it. It sounds f\*\*king horrible.

> I fingered you. I thought you were awake. I am really sorry it happened. I am f\*\*king stupid. I should not have done that. *There was no reason why I should have thought that was OK*, and I'm sorry, that was bad.

(Emphasis added.)

### 3. Appellant's Admissions to Others

In addition to the text message to SM and the pretext phone call with SM, Appellant made several admissions to others. Appellant texted EM the morning after that he had "f\*\*ked up" and "pulled a move on [SM]." He texted IM that same morning that he had "messed up." Later, in IM's room, Appellant told IM that he had "groped" SM and that SM "freaked out" and left his room. Appellant also told IM that he "fingered SM and he didn't know she was asleep." IM and Appellant then went to the home of another friend, RG. After Appellant relayed what happened to RG, RG asked Appellant "why he would just go straight for the vagina." Appellant replied that he did not know.

### G. Mil. R. Evid. 413 Notices, Motion, and Ruling

Prior to trial, the Government provided notice that it intended to offer evidence of uncharged sexual assault offenses allegedly committed by Appellant to prove the charged sexual assault offenses. Subsequently, another notice was provided to the Defense that the Government intended to also offer evidence of each charged offense of sexual assault under Mil. R. Evid. 413 to prove the other charged offenses. The Defense moved to exclude the evidence of the uncharged sexual assault offenses. Their motion did not address the use of evidence of the charged offenses as propensity.

During the hearing on the motion, trial counsel informed the military judge of their plan to have evidence of each charged offense be considered for the other two charged offenses. The military judge told the trial counsel "I'm not a giant fan of that one, but it doesn't mean I won't hear your argument." After hearing argument from both sides addressing the admissibility of evidence of uncharged sexual assault offenses under Mil. R. Evid. 413, the military judge granted the Defense motion to exclude that evidence.

8

After summarizing his ruling on the record, the military judge asked the Defense whether their motion to exclude evidence offered under Mil. R. Evid. 413 included evidence of the charged offenses and the "interplay" between them. The Defense responded that they were "not objecting to that at this point." The military judge then stated that he would not address it in his rulings. As it became clear during the trial counsel's findings argument, the military judge did permit the evidence of each charged offense to be considered and argued as propensity evidence to prove the other two charged specifications.

## H. Trial Counsel's Propensity Argument

Trial counsel, after discussing the evidence of the three separate specifications, ended his closing argument with the following propensity argument.

> You have the 413 instruction to consider, which is if you find one of these allegations by just a preponderance of the evidence, you can consider that for whatever weight you deem appropriate to the other specifications. And you can consider it as propensity evidence that the accused would do something like this.

> And that's a powerful instruction. That's a powerful thing to consider, because you have the accused's own words in regards to [SM] about what he did. Listen to the end of the intercept – "it was stupid and I had no reason to believe you were agreeing to that." Listen to his own words. And when you find that in regards to [SM], you can take that into consideration and the allegations involving [EM]. And finding that propensity, and finding the similarity between these two, you can use that evidence in your consideration.

## II. DISCUSSION

### A. Mil. R. Evid. 413, *Hills*, and *Hukill*

The meaning and scope of Mil. R. Evid. 413 is a question of law that is reviewed de novo. *Hills*, 75 M.J. at 354.

Mil. R. Evid. 413(a) provides that in a court-martial where the accused is charged with a sexual offense, evidence that the accused committed other sexual assaults may be admitted and considered on "any matter to which it is relevant." This includes using evidence of sexual assaults to prove the accused has a propensity to commit sexual assault. *United States v. James*, 63 M.J. 217, 220 (C.A.A.F. 2006).

However, in *Hills*, the CAAF held that evidence of the accused's commission of a sexual assault may *not* be used in this way if the alleged sexual assault is charged in the same court-martial and the accused has pleaded not guilty to

it. 75 M.J. at 356. The CAAF further held that the instructions accompanying the admission of evidence of charged offenses for Mil. R. Evid. 413 purposes "violated Appellant's presumption of innocence and right to have all findings made clearly beyond a reasonable doubt, resulting in constitutional error." *Id.* at 356. Because "there are constitutional dimensions at play," prejudice for such an error must be tested for harmlessness beyond a reasonable doubt. *Id.* at 357 (quoting *United States v. Wolford*, 62 M.J. 418, 420 (C.A.A.F. 2006) "An error is not harmless beyond a reasonable doubt when 'there is a reasonable possibility that the [error] complained of might have contributed to the conviction;'" *Id.* at 357-58 (quoting *United States v. Moran*, 65 M.J. 178, 187 (C.A.A.F. 2007) "To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Id.* at 358 (quoting *Yates v. Evatt*, 500 U.S. 391, 403 (1991), overruled on other grounds by *Estelle v. McGuire*, 502 U.S. 62, 72 n.4 (1991)) To determine whether the constitutional error was harmless beyond a reasonable doubt we consider the whole record. *Delaware v. Van Arnsdall*, 475 U.S. 673 (1986). Whether such an error is harmless in a particular case depends on a host of factors, all readily accessible to reviewing courts. *Id.* at 684. In addition to an assessment of the overall strength of the prosecution's case, we weigh whether and how trial counsel argued that Appellant had a propensity to commit a charged sexual offense using evidence of other charged sexual offenses.

In *United States v. Hukill*, 76 M.J. 219, 222 (C.A.A.F. 2017), our superior court clarified that *Hills* is not to be interpreted narrowly:

> [T]he use of evidence of charged conduct as M.R.E. 413 propensity evidence for other charged conduct in the same case is error, regardless of the forum, the number of victims, or whether the events are connected. Whether considered by members or a military judge, evidence of a charged and contested offense, of which an accused is presumed innocent, cannot be used as propensity evidence in support of a companion charged offense.

The court reiterated that, where such error exists, the Government must prove there was no reasonable possibility that the error might have contributed to the verdict. *Id.* at 221.

**B. Analysis**

The Government concedes that, in light of *Hills* and *Hukill*, the military judge erred in permitting evidence of the charged sexual offenses to be used pursuant to Mil. R. Evid. 413. We agree. Although the military judge's ruling is understandable, coming as it did before the decision in *Hills*, we must "apply

the clear law at the time of appeal, not the time of trial." *United States v. Mullins*, 69 M.J. 113, 116 (C.A.A.F. 2010) (citing *United States v. Harcrow*, 66 M.J. 154, 159 (C.A.A.F. 2008)).

Nevertheless, the Government avers that Appellant waived this issue at trial and that even if Appellant did not waive it, any error in Appellant's case is harmless beyond a reasonable doubt. We disagree.

### 1. Waiver

When an appellant intentionally waives a known right at trial, it is extinguished and may not be raised on appeal. *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009). In determining whether waiver occurred, courts consider "whether the failure to raise an objection at the trial level constituted an intentional relinquishment of a known right." *United States v. Campos,* 67 M.J. 330, 332 (C.A.A.F. 2009). "A forfeiture is basically an oversight; a waiver is a deliberate decision not to present a ground for relief that might be available in the law." *Id. at* 332 (quoting *United States v. Cook*, 406 F. 3d 485, 487 (7th Cir. 2005)). There is a presumption against the waiver of constitutional rights. *United States v. Elespuru*, 73 M.J. 326, 328 (C.A.A.F. 2014).

As noted above, upon being informed by trial counsel of the intent to use evidence of each charged offense as propensity evidence for the other two charged offenses, the military judge stated that he was "not a giant fan" of that. The military judge may have been prescient in his misgivings about the use of evidence in this manner, but CAAF had not yet decided *Hills*. *Hills* changed the law. By informing the military judge that they did not object when asked, the Defense may have missed and waived an opportunity to convince the military judge to prohibit use of the charged offenses as propensity evidence as unfairly prejudicial under the balancing test of Mil. R. Evid. 403. It cannot be said, however, that the decision not to object on those grounds amounted to an intentional relinquishment of a known right to object based on *Hills* and *Hukill*. We decline to apply waiver under these circumstances, especially given the presumption against the waiver of constitutional rights and the constitutional dimensions in play when this type of propensity evidence undercuts the presumption of innocence and confounds the burden of proof.

### 2. Harmless Error Beyond a Reasonable Doubt

The Government contends the error in Appellant's case is harmless beyond a reasonable doubt as to both the sexual assault and abusive sexual contact convictions. While we agree that the error is harmless beyond a reasonable doubt as to the sexual assault specification, we cannot be confident there is "no reasonable possibility that the error might have contributed" to the finding of guilty for the abusive sexual contact specification.

### a. Sexual Assault of SM

Appellant's multiple incriminating statements regarding this offense as well as the testimony of SM provided powerful evidence of Appellant's guilt.[4] Most compelling were Appellant's own words near the end of the pretext phone call.

> I fingered you. I thought you were awake. I am really sorry it happened. I am f\*\*king stupid. I should not have done that. *There was no reason why I should have thought that was OK*, and I'm sorry, that was bad. (Emphasis added)

In a few short sentences, Appellant essentially confessed to the sexual assault of SM. He admitted that he committed the sexual act of digital penetration of SM's vulva and while Appellant maintained he thought SM was awake, he conceded that any honest belief he may have held that SM consented was not reasonable. Just as damning as the pretext phone call to a mistake of fact defense for Appellant was evidence of his response to RG when asked "why he would just go straight for the vagina." Appellant replied that he did not know.

Notably, trial counsel did not argue to the military judge to consider evidence of the offenses committed against EM as propensity evidence to support the sexual assault specification. Given the overwhelming evidence of Appellant's guilt and the lack of an explicit reliance on this propensity evidence by trial counsel during the closing argument, we are convinced that the error in permitting the evidence supporting EM's allegation to be used for propensity purposes with regard to the sexual assault of SM was unimportant in relation to everything else the military judge considered in finding Appellant guilty of the sexual assault of SM. We conclude that there is no reasonable possibility that the error might have contributed to Appellant's sexual assault conviction. Accordingly, we find that the error is harmless beyond a reasonable doubt.

### b. Abusive Sexual Contact of EM

In contrast, trial counsel did specifically invite the military judge to consider the SM propensity evidence for the offenses committed against EM. Effectively, trial counsel attempted, through the use of propensity evidence, to buttress the case for the offenses against EM by relying on the aforementioned overwhelming evidence of guilt for the sexual assault. Unlike the evidence supporting the sexual assault, Appellant did not make multiple, clearly incrimi-

---

[4] While Appellant does not concede that the error is harmless beyond a reasonable doubt with respect to the sexual assault of SM, he does concede that the evidence of this offense was stronger than the evidence supporting the abusive sexual contact of EM.

nating statements regarding the offenses against EM. Exclusive of any contribution the SM propensity evidence may have made, the evidence supporting the abusive sexual contact conviction relied solely on the testimony of EM. The Government points to the acquittal of the aggravated sexual contact specification to support their contention that the military judge gave the propensity evidence little weight in reaching his findings for the abusive sexual contact specifications. Such speculation, however, fails to consider the impact of the evidence raising mistake of fact for the offense Appellant was acquitted of and whether the propensity evidence might have bolstered the credibility of EM in support of the abusive sexual contact conviction.

The trial counsel's invocation of propensity invited the fact-finder to buoy EM's credibility with evidence of the sexual assault offense committed against SM. In a case where the Government's only proof of the essential elements of abusive sexual contact relied on the testimony of the victim and an explicit appeal to propensity based on evidence of another charged sexual offense, we are not confident there is "no reasonable possibility that the error might have contributed" to the finding of guilty for that specification. Thus, we cannot sustain Appellant's conviction for abusive sexual contact.

### III. CONCLUSION

The findings of guilt as to Specification 1 of the Charge and the Charge are **AFFIRMED**. The finding of guilt as to Specification 3 of the Charge and the sentence are **SET ASIDE**. A rehearing as to the set-aside finding and sentence is authorized. Article 66(c), UCMJ, 10 U.S.C. § 866.

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court